MISSOURI & NORTH ARKANSAS RAILROAD COMPANY

*v.* EDWARDS.

Opinion delivered February 10, 1913.

1. MASTER AND SERVANT—DUTY TO FURNISH SAFE APPLIANCES.—A master is only bound to use ordinary care in furnishing safe appliances and apparatus for the use of its employees and is not required to furnish the best known instrumentality, but only such as are reasonably safe.  (Page 580.)

2. SAME—SAME—NEGLIGENCE.—In an action for damages against a railroad company for personal injuries, caused by the exploding of a water gauge, the fact that other railroads use devices different from that used by defendant for the particular purpose, would

not, in itself, be proof of negligence in the continued use by defendant of the gauge in use at the time of the accident.    (Page 581.)

3.  MASTER AND SERVANT—ASSUMED RISK.—Where a locomotive fireman is injured by the unexplained exploding of a water gauge, and no negligence on the part of the railway is shown, and the device for protecting the gauge is simple and the risks attending the same are open, patent and obvious, and plaintiff continually observed the gauge and shield, near him upon the engine upon which he worked, and he made no complaint of any kind, he will be held to have assumed the risk attendant upon his employment, and can not recover damages on account of his injury.    (Page 582.)

Appeal from Carroll Circuit. Court, Western District; *J. S. Maples,* Judge; reversed and dismissed.

### STATEMENT BY THE COURT.

This is a suit for damages for personal injury, alleged to have been caused by the negligence of the railroad company in the use of a defective glass water gauge, or one not properly protected by wire netting. It denied any negligence on its part and pleaded assumption of risk in bar to appellant's right to recover.

It appears that appellee was a locomotive fireman, thirty-three years of age, of three years' experience, and was making at the time of the injury $106 per month; that he had been engaged upon different lines of railroad as a fireman, and had been at work for appellant company for about ten months in that capacity. That he boarded the engine on the day of the injury at Leslie about 10 o'clock in the morning, as fireman, pulling passenger train No. 2. His run was from Leslie to Eureka Springs. When the train was about four miles north of Harrison, the glass water gauge on the front of the engine exploded and steam and a piece of glass struck him in the eye, the injury causing him great suffering and finally the loss of the eye. The water glass, or gauge was on the left hand, or the fireman's side, of the engine on the back end of the boiler in the cab, just to the left of the place where the coal is thrown in, the gauge being just above the head of the person throwing coal into the engine. Appellee reached for the chain to the door of the firebox to open it and put the coal in, his head being near

the glass at the time the blow-out and injury occurred. Nothing struck the glass. He had, in his experience as fireman, had water glasses or gauges to break before, and knew they sometimes burst without any apparent cause therefor. This water glass was a glass tube about eight or ten inches long, standing upright, encased in a copper pipe, or tube, with three slits in it equi-distant from each other, and large enough for the finger of a man to be inserted to wipe the dust and smoke off the glass that the stage of water could be more easily seen. No effort was made to show that the glass was defective nor the shield encasing it, but only that if it had been encased with a wire screen, or netting, instead of the brass pipe, with the slits or openings in it that it would have been safer for the employees working about it, and less likely to have caused an injury by an explosion, the wire netting being closer and more likely to prevent the pieces of flying glass from striking and injuring the operatives of the engine.

All the witnesses testified that the water glass, shielded and protected as the one that exploded, was regarded as standard equipment by a good many of the railroads of the country, the witnesses for appellant stating that they regarded it safer for employees and more practicable than the wire netting shield, while witnesses for appellee claimed that a great many of the better lines of railroad had discarded the equipment altogether, and used wire screen shields for the better protection of the employees.

A witness in the employ of the Baldwin Locomotive Works testified that he had been thirty-two years in its employ, and was familiar with all equipment and appliances of locomotives; had made a study to determine which are most modern and best adapted for use; that the locomotive works had been constructing water glasses for locomotives for thirty-two or thirty-three years of various types, and the Baldwin company now constructs and puts on the market one of the best type and grade made out of a piece of pipe turned at each end and fastened on

nuts with three slots in it, running the length of the pipe and identified the shield in use at the time of the accident as the glass and shield constructed by said company; stated that the company used it on every engine ordered from them, unless the person ordering had a special idea and ordered something different. In adopting this water glass, it was the company's purpose to give the engineer and fireman both a clear view of the stage of the water in the glass. Prior to the adoption of the shield a great many lines used a plain glass without any protection, except four rods surrounding it. He also said a majority of the railroad men and master mechanics that had been in the Baldwin Locomotive Works had accepted as being the best the type known as the Wisconsin Central Railroad water gauge or glass, the one in use in this case. That he had ridden on hundreds of engines having a gauge of like kind; never saw or heard of the shield of the netting type until coming to this country, and never saw a wire netting over the shield constructed by the Baldwin Locomotive Works, or a similar shield. Would consider it impracticable to use the netting over the shield, because it would obstruct the view, the water not always being clear.

Appellant's master mechanic testified that before the injury a part of its locomotives had the Baldwin Standard shield as a protector for the water glass, and the others had a wire netting with a large mesh; that all of the engines were equipped with one or the other of the shields to the water glass, that he thought the Baldwin water glass shield was the better, giving his reasons therefor, among which was that it afforded a better view of the water in the glass, was made of steel, and would better withstand the force of an explosion, that he had known the net guards to be blown out by the force of explosions of water glasses.

Appellee stated that he knew the water glass was protected by the three bar shield, but did not realize at the time that there was any danger of being injured in the way he was, although he had seen water glasses ex-

plode on engines before, and knew they did sometimes explode without any apparent reason. Also that he had heard the master mechanic for appellant, in talking to other parties, say that a shield such as was on this engine was all right, and was the best for protection. That this conversation occurred after he had been at work for appellant for probably a month. He did not claim that he had asked the master mechanic about the water glass, nor that the statement had been made to him further than he had heard the conversation, which was denied by the master mechanic.

The court instructed the jury, refusing appellant's request for a peremptory instruction, and from the judgment on the verdict against it, the railroad company appealed.

*W. B. Smith, J. Merrick Moore, Troy Pace* and *H. M. Trieber,* for appellant.

1. No actionable negligence is shown. Appellant fully complied with its duty to exercise ordinary care to furnish a reasonably safe appliance with which to work, when it adopted a water glass shield of a recognized type, a good shield of its kind, and used generally, and appellant was not guilty of negligence in not having in its place some other device of a newer, more modern or safer type. 57 Ark. 76; 54 Ark. 389; 31 Ark. Law Rep. 115-120; 91 Cal. 48, 27 Pac. 590; 52 S. E. (Va.) 700; 32 Md. 411; 189 Mass. 591; 77 Miss. 494; 1 Labatt on Master and Servant, §§ 38, 39; 142 N. Y. 31, 36 N. E. 813; 136 Pa. 318; 20 Atl. 517; 90 Ark. 411; 82 Ark. 11.

2. Appellee assumed the risk. *Supra;* 92 Ark. 109; 93 Ark. 153; 96 Ark. 206; *id.* 391; 77 Ark. 374; 1 Labatt, M. & S., §§ 388, 390; 2 Bailey on Pers. Injuries, § 401 p. 1133; *id.* pp. 1130, 1149; 56 N. W. (Mich.) 612; 71 Mo. 77.

*Wade H. James, Claude A. Fuller* and *Hill, Brizzolara & Fitzhugh,* for appellee.

1. There was sufficient evidence to warrant sending to the jury the issue as to whether or not the appellant was negligent in the appliances furnished.

2. The train upon which appellee was employed being engaged in interstate commerce, under the employers' liability act, the defense of assumption of risk was not available, if appellant was negligent in failing to use proper care in the selection of a safe appliance for the water glass. 98 Ark. 240, 253; 35 Stat. at Large, 65, 66.

Aside from the above statute, the question of assumption of risk was one which should have gone to the jury.

The doctrine of equal or superior opportunity of the servant to know the risk only applies to that class of dangers which are obvious, visible or manifest. 1 Labatt, on Master and Servant, § 407 and authorities cited; id. § 449; 2 Bailey on Personal Injuries, § 416.

KIRBY, J., (after stating the facts). It is insisted by appellant that the testimony does not disclose any negligence on its part in furnishing the water glass in use upon the engine, and that the appellee assumed the risk of operating the engine with it, as furnished, and therefore was not liable for the injury occasioned by the explosion.

The testimony shows that the Baldwin water glass shield in use on the engine at the time of the explosion of the water glass and injury to appellee was a recognized type in use upon many railroads and regarded as a good shield, and by many as the most practicable, and best that can be used for the protection of the glass and the employees working about it. Many other witnesses testified that such a shield was not as good protection to the employees in case of breakage and explosions of the glass as the net or wire screen shield, which was also shown to be in use upon certain other railroads. In any event, this water glass shield, was shown to be of the type in general use on railroads, the one used exclusively by the Baldwin Locomotive Works in the manufacture and equipment of locomotives, except upon special order of a different design, and it is also undisputed that appellee had observed continually this water glass and shield upon

this engine upon which he worked, near him, and made no complaint of any kind about it.

The master is only bound to the use of ordinary care in furnishing safe appliances and apparatus for the use of his employees and is not required to furnish the best known instrumentality, but such only as are reasonably safe. The fact that other and different devices are used by other railroad companies in preference to the one in use by it for the particular purpose would not, of itself, be proof of negligence in the continued use of the one employed. *Norfolk & Western Ry.* v. *Bell,* 52 S. E. (Va.) 700; *Sappenfield* v. *Ry.,* 91 Cal. 48; 27 Pac. 590.

In *Arkadelphia Lumber Co.* v *Bethea,* 57 Ark. 76, the court said:

"The general rule is, that an employee who enters upon service, knowing the kind of instrument or machine that he is to work with or about, assumes the risks incident thereto; and that his employer discharges his full duty in that behalf if he furnish or maintain a good instrument or machine of the particular kind, even though some other kind would entail less risks."

In *Pekin Stave Co.* v. *Ramey,* 104 Ark. 1, this court said:

"It is well settled that it is the duty of the master to exercise ordinary care to provide his servants with reasonably safe implements and instrumentalities with which to work, and also a reasonably safe place in which to perform their labor. But the master can not be charged with a breach of this duty simply on the ground that a safer method or a safer machine than that from which the injury resulted could have been obtained and might have been adopted. He is not required to furnish any particular kind of appliance, or instrumentality for doing the work. He has performed the full measure of his legal duty when he has exercised ordinary care to furnish an implement or instrumentality that is reasonably safe and suitable for the use of the servant and the work to be done. The fact that some other kind of machine or implement would have been safer, or better, than

the one which caused the injury is not the test of the failure on the part of the master to perform his duty, or of negligence from which to fix upon him a liability.''

It is also true that some of the other engines, a majority of them, perhaps, in operation upon appellant's road at the time of the injury, were equipped with water glasses protected by wire net screens. But as Labatt says: ''The mere fact that a master uses simultaneously different types of the same kind of appliance does not import culpability, the risk arising from these differences are deemed to have been assumed by the servant, provided they are apparent and may be detected without any special skill or knowledge.'' Again: ''A fortiori must the master be regarded as free from culpability where the evidence clearly shows that several methods are in general use, the choice being a matter of judgment depending upon the surrounding condition. The law then allows absolute discretion to select according to his own judgment.'' 1 Labatt, Master and Servant, section 38; see also *Harley* v. *Buffalo Car Mfg. Co.,* 142 N. Y. 31; 36 N. E. 813. 1 Labatt Master and Servant, section 39; *Titus* v. *Bradford,* 136 Pa. 618; 20 Atl. 517.

The appliance here complained of is a simple device, the risks attendant upon the use of which are open, patent and obvious, and it is undisputed that appellee continually observed the water glass and shield near him upon the engine upon which he worked, and made no complaint of any kind about it.

In *Railway Company* v. *Davis,* 54 Ark. 389, the court said: ''The servant agrees to use in the service the particular kind of implement or machine, and if, under such circumstances, harm comes to him it must be ranked among the risks he assumed when he entered the service.''

In *Ark. Midland Ry. Co.* v. *Worden,* 90 Ark. 411, the court said: ''When an employee takes service with his employer, he impliedly agrees to assume all the obvious risks of the business, including the risks of injury from the kind of machinery then openly used, as well as the method of operating the business then openly observed.''

Citing *Choctaw, O. & G. Rd. Co.* v. *Jones,* 77 Ark. 367, and other cases.

In *St. Louis, I. M. & S. Ry. Co.* v. *Corman,* 92 Ark. 109, the court said:

"When he enters into a contract to perform service for his employer, he agrees to work at the place expressly or impliedly designated in the contract, and with the tools and appliances regularly furnished by the master for use, 'so far as these things were open and obvious, so that they could readily be ascertained by such examination and inquiry as one would be expected to make if he wished to know the nature and perils of the service in which he was about to engage.'" See also *Chicago, O. & G. Rd. Co.* v. *Thompson,* 82 Ark. 11; *Arkadelphia Lbr. Co.* v. *Bethea, supra.*

The appellee was a man of average intelligence and had been in the employ of the railroad as a fireman for ten months. He knew that some of the engines in operation upon the road were equipped with water glasses encased and protected with a wire net shield, and others with the Baldwin three-bar steel or copper shield, as in use upon the engine upon which he was at work at the time of the injury. This water glass with its shield was near him on the back of the boiler, on his side of the cab, where it was known to be and easily and continually observed by him, and he also knew that water glasses occasionally burst and exploded, and must have known that the pieces of flying glass could escape from the slots left in the shield for observing the stage of water in the glass, the only danger in the use of it which might arise from its breaking or explosion. Neither is it claimed that there was any defect in it, and upon the whole case, we think it is controlled by the decision in *St. Louis, I. M. & S. Ry. Co.* v. *Wells,* 93 Ark. 154, a case precisely in point on the question of assumption of risk.

There was no assurance of safety from the master to cause him to remain in the service nor any complaint from him to the master of a defective or unsafe water glass shield nor was any promise to repair or remedy the

defect claimed or relied upon as in the case of *St. Louis, I. M. & S. Ry. Co.* v. *Swaim,* 105 Ark. 224, 150 S. W. 861, recently decided.

The court erred in refusing to give appellant's requested peremptory instruction, and the judgment is reversed and the cause dismissed.